## Utica Hydraulic Cement Company v. Elizabeth Whalen, Admx., etc.

### Gen. No. 4,393.

1. Assumed risk—*when injury deemed the result of an.* Where an injury results to an employe by reason of a danger produced by himself and his associates, and it appears that it required no special experience or intelligence to see and appreciate such danger (which was as obvious to the employe and his associates as to any one else), the doctrine of assumed risk applies.

2. Safe place to work—*when rule requiring master to furnish, does not apply.* The rule which requires a master to furnish a safe place to work does not apply to that class of cases where the work which the servant is employed to do is constantly producing changes and temporary conditions, for the time being more or less hazardous for those engaged in the work, and where it would be practically impossible to keep the conditions safe and prosecute the work.

Action on the case for personal injuries. Appeal from the Circuit Court of La Salle County; the Hon. Charles A. Bishop, Judge, presiding. Heard in this court at the April term, 1904. Reversed, with finding of facts. Opinion filed November 12, 1904.

Duncan, Doyle & O'Conor and McDougall & Chapman, for appellant.

Browne & Wiley and Brewer & Strawn, for appellee.

Mr. Presiding Justice Farmer delivered the opinion of the court.

This is an appeal from a judgment against appellant in an action on the case in favor of John Whalen for $1,500. This case was before this court at a former term and the judgment reversed and the cause remanded. At the first trial the court directed a verdict for defendant and plaintiff appealed. This court held that under the evidence in that record, the case should have been submitted to the jury. Since this case was submitted to this court the death of John Whalen has been suggested and Elizabeth Whalen, his administratrix, has been substituted as appellee, but John Whalen will be designated as appellee in the following opinion.

Appellant was engaged in the business of manufacturing cement, at Utica, in La Salle county. The rock it was quarrying for that purpose at the time of appellee's injury, was from seven to nine feet below the surface of the earth. Above the cement rock were stone and earth, which had to be removed before quarrying the cement rock. The method of removing it is called "stripping," and was done by first drilling holes back some distance from the face of the working, down to the cement rock, and blasting with powder or dynamite to loosen up the material overlying the cement rock. After this was done gangs of men, of from six to eight in a gang, standing on the cement rock, shoveled the loose stone and earth into small cars that were run on tracks up to the face of the work, and moved out by horse power. On the 7th of March, 1899, a frozen crust of earth and rock fell from the top down the embankment against appellee, breaking one leg in two places and otherwise injuring him. The declaration, in substance, charges that it was the duty of appellant to so conduct its mine or pit that the sides or walls thereof would be firm, and the earth, sand, rock and other substances firmly held in place, so that its employees might perform their work with safety, but that appellant negligently failed to do this, and permitted its said excavation, mine, or pit to remain in an unsafe condition, and the sand, rock and other substances in the walls to remain in a loose and dangerous condition; whereby plaintiff, an employee of defendant, while engaged in performing his work and exercising due care for his own safety, was injured by a large body of rock and other substances falling upon him. The blast that loosened this frozen crust of earth and rock had been fired some days before the accident. The crust was from eighteen inches to two feet thick, several feet long and three or four feet wide. It was not left in an overhanging position by the blast, but as the men removed the loosened earth and stone from the bottom of the bank the face of loose earth and stone above would slip down, and in this way the crust at the top was left projecting from the bank or face of the

working until finally so much of its support was removed that it broke and fell. That appellee helped to remove the support from beneath the crust, and that he saw it over-hanging for some time before it fell is not disputed, but it is contended in his behalf that appellee's employment was exclusively shoveling dirt and stone on the cars from the bottom of the bank, and that appellant employed and fur-nished another set of men, whose duty it was to pull down all loose and overhanging rock and other substances and keep the face in a safe condition for the shovelers, and that appellee had a right to rely upon this duty being per-formed, and was not bound to examine the conditions for himself to determine whether they were safe or not. We have read the testimony with care and are of opinion that it does not support appellee's position. The evidence shows that these " stripping " or " loading " gangs were composed of from six to eight men each, and they were provided with shovels, picks, bars and sledges or nails. Some of them shoveled the loose material on the cars, and others, when necessary, used picks, bars or sledges to pull down and break up stone and any other large body of material in the face of, or overhanging the working. No one was specially employed and directed to use the picks while others were employed to do nothing but shovel material into the cars. As to who should use the picks and who should use the shovels seems to have been left to the determination of the men themselves, according to their convenience and prefer-ences. The same man would part of the time shovel and a part of the time use picks or bars in getting material ready for the shovelers, and no set of men were specially em-ployed to keep the face of the working in safe condition by the use of picks, while others did the shoveling. After the blast was fired the "loading" or "stripping" gang began the work of removing the loosened material, and deter-mined among themselves the manner of doing it, and who should use shovels and who should use picks or other instru-ments or tools. It required some time to remove a suffi-cient amount of the loosened material to cause the crust to

project beyond the face of the bank, and therefore the danger of its falling on the men working below did not suddenly arise. The proof shows it had been overhanging to some extent for a day or two, and appellee says he noticed it an hour or more before it fell, on the day of the accident. It projected on that day, according to the evidence, from three and a half to six feet beyond the face of the bank. Appellee testified that every ten minutes for three or four hours before his injury he had been working, shoveling dirt on the car from the place where he was injured. The reason for his working in this place in ten minute periods was, that it took about that long to load a car, and as soon as the car at one place was loaded the men stepped a few feet away to an empty car and loaded it, while the first one was being hauled out and unloaded and returned to the place for loading again. It clearly appears that the dangerous and overhanging condition of this crust was produced by the gang of men appellee belonged to, removing the support from underneath it. The proof shows also that it was observed by the men and thought by some of them to be dangerous. Two of the men working at this place, whose work appears to have been laying and removing the tracks upon which to operate the cars, on the day of the accident and before it happened, made some effort to get this overhanging crust down, but did not accomplish it. The proof shows also that before the accident the unsafe condition of this crust was the subject of discussion among the gang of men appellee was working with. One of appellee's witnesses, who worked in the same gang with him, says they thought the crust would not break off and fall, but would tip over and slide down the face of the bank. Appellant's foreman testified that on the morning of the accident, and before it happened, he came to the place where appellee was at work and called the attention of the men to the overhanging crust, and told them to take bars and go up and let it down. He did not stay to see the orders obeyed, but went to some other part of the work, and shortly afterwards the

accident happened. He is corroborated by two witnesses who were working with appellee at the time.

Our view of this case therefore is, that there are two insurmountable obstacles in the way of a recovery by appellee: first, it seems clear from the evidence that the injury resulted from an assumed risk of the employment; second, that appellee was not in the exercise of due care and caution for his safety.

The danger to which appellee was subjected was produced by himself and his associates by the removal of the support from under the frozen crust. It required no experience or special degree of intelligence to see and understand the danger. It was as obvious to appellee and his associates as it would be to any one else. Appellee was not ordered by his employer into a place he was unacquainted with and about the safety of which he knew nothing, nor into a place the safety of which was the special care and duty committed by the master to another class of employees. He had been engaged in this kind of work for appellant at intervals for twenty years and knew the effect of removing the support from underneath large bodies in the bank or on the surface above where he was shoveling. He and those working with him in the same line had full control of the manner of "stripping" the material from above the cement stone after the blasting was done. If they produced an unsafe condition by the removal of the support underneath large bodies, causing them to project beyond and overhang the face of the bank, it was their duty to remove such unsafe projecting body. Appellee had no right to continue to remove the dirt and stone below this crust, causing it to project four to six feet beyond the face of the work, until finally for lack of support it fell and injured him, and then attribute the injury to the fault and negligence of appellant. The facts in this case are so different from those in the cases cited by appellee in his brief in support of the judgment that we think they do not sustain his position. For instance, in Western Stone Co. v. Muscial, 196 Ill. 382, there had been a rain the night before

plaintiff was injured, and mud, clay and gravel had fallen from the face of the bank to the bottom of the quarry so as to interfere with the work. Plaintiff was ordered by defendant's foreman to shovel the mud and dirt into wheelbarrows. From the place where plaintiff was working the wall of the quarry rose perpendicularly some twelve feet to the top of the rock, and from the top of the rock the bank sloped upward about fifty feet higher. The evidence tended to show that no inspection of the bank had been made by defendant before plaintiff was ordered to work. The court say : " It was not a part of appellee's duty to secure this bank, but appellant had in its employ certain men provided with a machine to ' strip ' the bank, and to prevent its falling upon the men working in the quarry below, and the foreman of appellant was given orders to look out for the bank every morning." In City of La Salle v. Kostka, 190 Ill. 130, plaintiff was injured by the banks of a sewer he was excavating caving in, and recovery was had because the city failed properly to brace or shore the walls of the sewer so as to prevent them from falling in. This was no part of the duty of plaintiff and it does not appear that any dangerous condition of the banks or walls was observed by him before the injury occurred. In Barnett & Record Company v. Schlapka, 208 Ill. 426, plaintiff was injured while at work in a tunnel he had been ordered into by defendant. It appears he had not worked there before and was unfamiliar with the conditions. He looked at the wall of the tunnel and asked the foreman if it was solid and was told that it was, and directed to proceed to work. While in the tunnel it caved in from the top and injured plaintiff. The court held plaintiff did not know of the existence of any danger, and under the facts had a right to rely upon the assurance of defendant that the tunnel was safe.

The facts in this case render inapplicable the rule that it is the duty of the master to furnish the servant a safe place to work, and that a failure to do so and a resulting injury therefrom renders the master liable. This case belongs to that class where the very work the servant is em-

ployed to do is constantly producing changes and temporary conditions, for the time being more or less hazardous to those engaged in the work, and where it would be practically impossible to keep the conditions safe and prosecute the work. Appellee had been engaged for appellant in the kind of work he was employed at when injured for years, and had been working some days, stripping where the injury occurred. If previous experience were necessary to inform him of the conditions produced and hazards and dangers attending the prosecution of the work, he certainly had the experience. He knew that large masses of stone and other substances were left in the bank or on the surface when loosened up by the blasts and that to remove the dirt or other support from beneath them would cause them to fall. It was the duty of him and his associates to pull down by picks and bars and break up these masses and keep their place of work in safe condition. This was one of the duties of their employment and the requirement was reasonable. It was held in Larsson v. McClure, 95 Wis. 533, that the danger of a bank which is being taken down in a gravel pit is obvious, and where servants engaged in the work have ample facilities for discovering and removing the danger the master may impose upon them the duty of doing so. It was impossible to prosecute the work that appellee was engaged in without producing such conditions as occasioned his injury. He knew that to remove the support from beneath the crust at the surface would eventually cause it to fall as well as the master did, and he also knew that the duty of removing the danger before injury should result from it was committed to him and those working with him. Clearly, therefore, the master did not owe him the duty of keeping the place where he was employed in safe condition. Richardson v. A. P. Co., 72 Ill. App. 77; Armour v. Hahn, 111 U. S. 313; Clark v. Liston, 54 Ill. App. 578; Mueller v. Schwecht, 62 Ill. App. 622; Chicago Edison Co. v. Davis, 93 Ill. App. 286. In Miller v. Thomas, 15 App. Div. N. Y. 105, the master was held not liable where employees in shoveling coal left an overhanging frozen crust of coal which fell and injured

one of them.    A workman employed in a quarry, in which the constant removal of stone during the progress of the work, by himself and fellow-servants, constantly changes the conditions, assumes the risk of the place becoming unsafe and cannot recover for an injury resulting from the fall of the mass of stone loosened by blasts.    Mielke v. C. N. W. R. R. Co., 103 Wis. 1.    In Bedford Belt R. R. Co. v. Brown, 142 Ind. 659, it was held that the master is never liable for failing to supply a safe place for the servant to work where the work consists in making safe the place and the condition of which he complains.    The Supreme Court of California held in Cullen v. Bull, 113 California, 593, that the rule which requires the master to provide a safe place for the servant is applied when the place in which the work is to be done is furnished or prepared by the master, but that it has no application when the place at which the work is to be done is prepared by the servant himself.

That dangers of the character which resulted in appellee's injury were assumed risks of his employment, we think, cannot be controverted.    C. & E. I. R. R. Co. v. Heerey, 203 Ill. 492, and authorities there cited.    It is insisted, however, that whether or not it was an assumed risk, was a question of fact which was properly submitted to the jury, and their verdict, when approved by the trial court, should have great weight in an appellate court.    Where the evidence is conflicting this is true, and an appellate court would hesitate to disturb a verdict and judgment in such a case if the evidence for plaintiff fairly tended to support it, although the weight might seem to be on the other side; but to our minds only one conclusion can be drawn from the evidence in this case upon this subject, and in such cases it has been held that whether an injury was received as a result of an assumed risk becomes a question of law.    Browne v. Siegel, Cooper & Co., 191 Ill. 226.

That appellee was not in the exercise of reasonable care and caution for his own safety also abundantly appears from the evidence.    In addition to the evidence we have before referred to, as to his and his fellow-workmen's

knowledge of the overhanging condition of this crust of frozen earth before it fell, Mr. Swanson, appellant's foreman, testified that appellee told him immediately after the injury that it was his own fault.    Mr. Blakesley, general superintendent for appellant, and a Mr. Young, who represented a casualty company in which appellant was insured, testified that ten days after the injury they called at appellee's house, and Young took appellee's statement of the circumstances of his injury in writing.    The writing was introduced in evidence and stated that appellee was familiar with the kind of work he was doing and  knew it was dangerous, and had been warned by the superintendent not to undermine  dirt  and rock too far, that remained in the bank; and further stated that no one was to blame for the accident.    True, appellee denies making these statements, and no one else testified who heard any of them.    Appellee claimed that  if  he made the written  statement offered in evidence  he was  delirious at  the  time, and  offered proof tending to show that he was  not entirely rational at times for several days after the injury.    There was also proof in addition to that of  Blakesley  and  Young tending to show that, with the possible exception of conditions produced by medicines, he was in his right mind.    Blakesley and Young both testified  that  he was when  the  statement  was made. That his  injury was not the  result or fault of  the negligence of appellant is clear, and that he so regarded it at the time of the injury is, we think from the evidence, probably true, but whether he did or not is not material and does not alter  the facts.    To  our minds appellee did not prove a cause of action and the judgment is reversed.

<em>Reversed.</em>

Finding of facts, to be incorporated in the judgment of the court:

We find that John Whalen's injury resulted from an assumed risk of his employment, and also that he was not in the exercise of due care and caution for his own safety at the time.